Council for Ms. Boyd, please. Hello, my name is Tim Cornell and I am counsel to the appellant and I would like to reserve two minutes for rebuttal. You may. Thank you. I think that this appeal will certainly render a very interesting opinion because there are some very interesting issues here. Right out of the gate, the issue of personal jurisdiction is a fascinating one. Here we have Auerbach and Alphacor who were out of state, but they designed a protocol that they knew was going to take place within Massachusetts. Basically they wrote the script that the actors then acted out. Let's call it Act 3 taking place in Massachusetts, designating Dr. Schaefer as a part in the protocol. Everyone then acted out on that script on that stage. Mr. Ward goes to Maryland and gets injected with the protocol, comes back to Massachusetts where the protocol is in his body and it's taking place. They get the data from his body that took place in Massachusetts and they use that for their own business furtherance. So we have, I think, personal jurisdiction on a few grounds. The Supreme Court has made clear in recent decisions, Bristol-Myers and Ford versus Montana, that important factors when considering personal jurisdiction are where the plaintiff is located and where the plaintiff was harmed. Here the plaintiff was certainly located in Massachusetts and was harmed in Massachusetts. That's where he was living. That's where the protocol, by and large, time-wise, was taking place within his body. Excuse me, I thought that the protocol was administered by NIH in Maryland and indeed that Mr. Ward moved to Bethesda to facilitate that. Correct, but he was living in Massachusetts. He went to NIH for the application of the protocol and came back to his home in Massachusetts. Yes, that's true. And that's what I'm saying. May I ask, do you have a record site for the argument that you just made that Mr. Auerbach and AlphaCore wrote the protocol? That they designed the protocol? That they designed the protocol. I don't have it off the top of my head, but I will get it for you on rebuttal. Okay, do you know if it's in your brief? It is in my brief, yes. Okay. And with citation. And so we have personal jurisdiction on a few grounds here. Number one, AlphaCore and Auerbach, if we take the lessons from Ford v. Montana, that if a defendant from outside of the state is intentionally exploiting a market inside of the state, and if we consider Mr. Ward to be the entire market of those with LCAT deficiency, because he's a one-of-a-kind patient, he was the entire market of LCAT deficiency, they were using that market that was in Massachusetts. They were exploiting it. They derived a great deal of money from it. Very similar to selling a car in Massachusetts. That's one. And the second part is, as I said, the protocol that was administered in Maryland was still in his body. They knew it was going to be in his body. The data that they collected came from Massachusetts. And I think that's sufficient to give us personal jurisdiction. What's your best authority for that latter proposition? Yeah, I think Ford v. Montana, Supreme Court. Yeah, no, I'm familiar with that. I must confess, I struggled to see its applicability when I'm familiar with it. I'm sorry, I couldn't hear the last part. You struggled to see? I said I struggled to see its applicability to this situation. It seems to me this is quite a different case. Well, you know, as I'm saying, what the Supreme Court said to look at were a few factors. One is where was the plaintiff harmed? What were the defendants doing? Did they purposely take advantage of the markets that are inside of Massachusetts? That's Ford v. Montana, and I think that applies here. Okay. Counsel, you said that they derived, just assuming for a moment that a single patient can be a market, you said that they derived great monetary benefit from the protocol. Again, do you have any support for that? I don't think I see that in your brief. Oh, well, I mean, that's kind of what the case is about. So they used him for the data that supported their development of this drug, that they then were able to sell the company to AstraZeneca. Is there evidence that that was the basis on which they sold the company? Is there evidence that that was the basis on which they sold the company? They had reported positive results, and shortly after, the company was sold. That was quick. We still have two minutes. But there's no evidence in the record about the details or the basis of the sale, because I looked for that. That's fine, but the fact is that they were using it. Their entire business was developing this drug. That was their business. The matter of profit is irrelevant. It's whether they were using that for their business, and they certainly were. There's no question of that. If I may quickly go to informed consent. Dr. Schaefer was unable to produce an executed informed consent form for this trial, so it fell to whether he had the duty for informed consent. Does informed consent have to be given by the particular physician, or was it enough that there was a multi-page, very detailed informed consent form prepared by NIH and signed by Mr. Warren? Why doesn't Dr. Schaefer get the benefit of that? That's a very good question, but the First Circuit and the courts have held repeatedly that the person who has the duty to obtain informed consent must themselves obtain informed consent. If he had that duty, he did not. As I said in my brief, the judge left it to the jury to determine what his role was, period, but that's not enough. Whether he had a tangential role or a central role or what kind of role is somewhat irrelevant. The central question is whether he had that duty to obtain informed consent, and I will return. Thank you. Good morning. Good morning. Tory Wiegand on behalf of Dr. Schaefer. This was a 10-day trial. The asserted errors are two of the jury instructions and one for an evidentiary ruling. I submit there was no error and certainly no material prejudice. As to the informed consent instruction, the court properly instructed on applicable principles under Massachusetts law and was not required to use the language that the plaintiff suggests. It fell well within the judge's discretion. Here, he informed the duty to inform requires a doctor-patient relationship. He informed that the relationship exists when the doctor participates in the care and treatment, that a duty arises when the doctor serves as a primary or lead in treating the patient or discusses a course of treatment in detail. He also mentioned that were a physician only tangentially involved in the care, there may not be a sufficient doctor-patient relationship. And that is taken right from the SJC's Heller decision. And as noted by Judge Stelia, related to his earlier question, there was an instruction where there was no objection, where the judge addressed where multiple physicians are involved in a patient's treatment, which could be argued to be these facts here. And that is, it was explained that not in all circumstances do separate physicians have to give separate informed consent, that there might be a situation where a consent given by one would be good for all. He also mentioned, though, that if that consent was inadequate, it would also be deemed to be applicable to those other physicians. And there was no objection to that. Counsel, can I ask you a question? Do you agree with the plaintiff's argument that it would be a correct statement of the law that a physician can have a duty to obtain informed consent even without providing direct treatment to the patient? Do you think that's correct or not correct? I don't think that is a correct statement of the law. I think insofar as if it's saying that, let's say he was the investigator for this protocol and was overseeing it while another doctor administered it, I would still say that's participating and that may trigger a duty of informed consent. My question wasn't about participating. It was, do you have a duty even if you're not providing direct treatment? I believe there could be situations where, depending on the roles of the physician, like an anesthesiologist doing anesthesia versus the surgeon doing the surgery, there may be an obligation in those circumstances to give the particular informed consent for that aspect of the procedure. But I think when you take these instructions as a whole, the issue was, was he sufficiently involved and sufficiently involved with the patient to trigger any duty? But the backdrop of this, as you see from the papers, is there was no dispute that Dr. Shamburek was the lead investigator, no dispute that he drafted the informed consent, no dispute that he went through that informed consent with Mr. Ward, and that he assumed that duty of informed consent. Now, whether that was adequate or not adequate was for the jury, and they resolved it against Mr. Ward. As to the other claims of error, real quickly, the race ipsa, the judge refused to give that instruction. It was just inapplicable. This is the lack of informed consent case. Race ipsa is for negligence. As you know, it's for that rare circumstance where you have an event that can only be explained due to negligence, and you're allowed to draw that inference. It had no applicability here. He was trying to have the jury draw an inference that he suffered an episode of atrial fibrillation during the protocol. He didn't have an expert to support that. He tried to use the race ipsa as a gap, and it just doesn't apply, and so there was no error. And the final challenge on appeal is as to the judge's decision to exclude the patent, a 24-page document that was offered. I would first point out that there was never any offer of proof made at the time. Doesn't the patent really constitute an offer of proof in and of itself? I'm a great believer in offers of proof, but when you're putting in a document, doesn't the document speak for itself? There may be such circumstances, but I think there's an obligation to point out to the judge this is why we're seeking to admit it. Identify the evidentiary theory so the judge can make an informed decision. Certainly would be helpful. I'm just questioning whether that's an obligation, but go ahead. Yeah, but I think in this case, Judge, the patent is a fairly technical document. It's detailing the intellectual property protection, so I think that in and of itself would suggest you really need to be clear as to why you're seeking to introduce it. And so that was never done here, and I would just suggest and make the arguments in my brief that it simply wasn't relevant to the issue of informed consent. And the issue was Mr. Ward said that he thought that this whole experimental treatment was going to cure his end-stage kidney disease. That's not what the consent form said. That's not what the testimony was. As to what these intellectual property terms of the patents had to say on that was really far removed, so I think it fell well within the broad discretion of the judge to exclude. So with that, I would otherwise rest of my brief. Thank you, Counselor. Thank you very much. Thank you. Good morning. May it please the Court. John Allen for AlphaCore Pharma. Simply put, Your Honors, Mr. Ward cannot establish personal jurisdiction under either the Massachusetts long-arm statute or constitutional due process. What this case was, what the complaint was, was really a Section 3D argument. Mr. Ward was alleging that tortious injury was caused to him within the Commonwealth by AlphaCore outside of the Commonwealth. The problem, of course, with that is there was no evidence necessary to support the other factors required under Section 3D, substantial revenue, persistent course of conduct, regularly doing or soliciting business within the Commonwealth. So what's happening now is the appellant is trying to pigeonhole this case into a Section 3B under the Massachusetts long-arm act. They're arguing that AlphaCore supplied the drug into Massachusetts and oversaw the protocol in Massachusetts. Neither of those things are true. The record shows... All right. Well, excuse me. Before we get to the truth of those, I take it you're saying as a preliminary matter that these arguments were not made below and therefore are weighed. Well, I'm not sure that these arguments weren't raised below, Your Honor. Okay. What the argument below really was was more general in the sense that AlphaCore had purposely availed itself of Massachusetts. So when you say they changed this theory from 3D to 3B... Well, they know they can't support... You're not really saying that. They may have changed their emphasis. That's true, Your Honor, because they can't support 3D, so they focus now on 3B. And, of course, the problem is the drug was donated to Maryland, to NIH in Maryland. It never was in Massachusetts. Oversight and administration of the protocol was exclusively by NIH, also in Maryland at their facility, not in Massachusetts. Does the record show whether they drafted the protocol? Your Honor, the record, it was an NIH document. The final protocol is included in Mr. Auerbach's second affidavit. It's an NIH document. I think there's enough in the record to infer that AlphaCore may have provided comment on it. One thing I will note, Your Honor, is that Mr. Ward didn't submit an affidavit below. There is no verification. There is no authentication of any of his materials that he attempted to rely on in support of personal jurisdiction. Thank you. Thank you. Thank you. May it please the Court, Mark Furman, appearing for Bruce Auerbach. Like AlphaCore, we, of course, argue that there's no basis for personal jurisdiction. Fact specific, Mr. Auerbach, a Michigan resident, never in Massachusetts, is one of the founders of a Michigan company, and it's asked to donate LCAT by the NIH, and it agrees to. And it manufactures the product in Oklahoma and shipped it to Maryland, not to Massachusetts. Mr. Auerbach never spoke to Mr. Ward in Massachusetts. And Mr. Auerbach did not initiate any contact in Massachusetts. And the only treatment site was Maryland, as Mr. Allen pointed out. So AlphaCore was not the sponsor. The only time that Mr. Auerbach met Mr. Ward was in Maryland in January of 2013. And by March 27, 2013, the membership interests in AlphaCore were sold. And Mr. Auerbach no longer had any relationship. So there were no contacts after that, except for a few communications 18 months later, where Mr. Auerbach did not respond or inclined to speak to. Thank you. So just to conclude, Your Honors, the court's decision on finding no personal jurisdiction should be affirmed. Thank you. Your Honor, I do not have on me the specific record site, and I can supply that after the hearing if you would like. But there are e-mails from Dr. Schaefer to Rebecca Baker of AlphaCore, in which Rebecca Baker is responding back that she's debating whether Massachusetts should be the administration site, or it should be Maryland, and they're discussing that back and forth. So it's perfectly clear that she is sort of part of the design of the protocol. If I could go to the race ipsa argument that I was not able to before. So just to make clear, this is a protocol that had never been used for this purpose before. There was no medical history for it. There was no data on how it would affect a patient such as Mr. Ward. Mr. Ward was in the NIH hospital when the episode struck. They had entire control over him. They were administering the protocol at the time. Under these circumstances, given the fact that it was a one-of-a-kind thing, there is no expert that could testify direct causation because there is no data. In the absence of that, it is not a matter that's too complicated for a jury to understand. The judge did not dismiss the elements of race ipsa. He merely said it was not something that he wanted the jury to weigh into. As far as the patent goes, very complicated patent, but count one says that it is not for someone with LCAT, which is exactly what Mr. Ward had. And that would be a strong element both of informed consent and whether it was appropriate for Mr. Ward. Thank you.